UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20654-CIV-HUCK/O'SULLIVAN

THOMAS BENITEZ RIONDA,

      Plaintiff,

vs.

HSBC BANK U.S.A., N.A.,

      Defendant.

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Tomas Benitez filed suit against HSBC Bank U.S.A., N.A. alleging claims for violation of the Florida Whistleblower Act, breach of contract, and unjust enrichment. On August 25, 2010, Defendant HSBC Bank moved for summary judgment [D.E. #18] on Counts I–III. The Court has considered the parties' pleadings and the relevant evidence. For the reasons discussed below, the Court grants HSBC's Motion.

**I.    STATEMENT OF FACTS**

      Plaintiff Tomas Benitez was a Senior Vice President in Defendant HSBC's private banking division from October 2, 2000 until his termination on January 23, 2009. In that role, Benitez managed the Guatemala team and the Special Investments Group team. Benitez reported to Antonio Suarez—Senior Vice President and Head of Private Banking—who in turn reported to the Managing Director of HSBC's Miami office, Manuel Diaz. Suarez worked with and supervised Benitez for "decades," and Diaz knew Benitez in a professional capacity for more than thirty years. Reviews of Benitez's performance during his time at HSBC reflect that he did his job in a proficient manner.

      In September and October 2008, Benitez raised concerns with Suarez and Diaz related to two clients who he believed were improperly and illegally trading with Cuba. For one of these two

1

clients, Benitez was involved because he supervised an employee—Julio Revuelta—who maintained the account through HSBC's Guatemala team. Benitez advised Revuelta to consult with the Compliance Department to ensure compliance with U.S. law. Benitez alleges that Suarez and Diaz did not effectively address his concerns regarding either client. The record does not reflect whether Revuelta or any of Benitez's other employees were aware that Benitez raised concerns to Suarez and Diaz related to these clients.

In late-2008, Diaz submitted documentation to HSBC's Remuneration Committee regarding bonuses for Benitez and the teams that Benitez oversaw. Diaz then met with Benitez to discuss the process. By early-January 2009, Diaz notified Benitez that Benitez and his team members would receive bonuses for their 2008 performances. Benitez informed his employees of this. However, the bonus amounts for Miami HSBC employees were not finalized by the Remuneration Committee until after Benitez was discharged on January 23, 2009. Additionally, HSBC's Employee Handbook includes a Compensation Administration Policy which states that

> All bonuses are strictly discretionary and may be awarded or not awarded at the sole discretion of the Company. Bonuses, if any, are usually awarded annually and paid in the first quarter of the fiscal year following the performance year. The Company takes a number of factors into consideration in determining whether to award a bonus to an employee, including, but not limited to, the performance of the Company, the business unit in which the employee works, and the employee. Employees must be in an "active working status" at the time bonuses are paid to be eligible for the bonus. "Active working status" means that the employee has not resigned, (or given notice of his/her intention to resign) or has not been terminated or been given notice of his/her termination.
>
> The Company reserves the sole right to add, amend, or discontinue any and all salary administration programs, procedures, practices, guidelines, etc., including, but not limited to, job evaluations, salary ranges, promotions, merit increases or bonuses, discretionary payments of any kind, periodic performance reviews, salary grade changes, etc. for any reason and without prior notice.
>
> An employee receives pay for work performed and does not receive a "guaranteed" weekly, biweekly, monthly, or annual

> salary, although for convenience and clarity, the timing of payments for work performed may be stated in these terms. The Company reserves the right not to pay an employee for any time not worked.

In prior years, Benitez also received letters notifying him that his discretionary bonus was contingent on being employed at the time that bonuses were paid.

On January 7, 2009, Julio Revuelta went to HSBC's Human Resources Department—specifically Miami Human Resources Vice President Jean Grillo and Pilar Rodriguez, who was the Vice President and Human Resources Manager for the International Private Bank Americas—regarding a conversation that another employee had with Benitez. Revuelta told Grillo and Rodriguez that he was unsure of what to do until a colleague, Diana Saludes, who was Benitez's Assistant Group Head for the Guatemala team, told him to bring his concerns to Human Resources. The conversation that Revuelta relayed to Grillo and Rodriguez involved a sexually suggestive comment made by Benitez. Previously, in late-2008, several employees that Diaz supervised, including Revuelta and Saludes, brought concerns to him regarding comments made by Benitez, but Diaz did not take those concerns to Human Resources.

This was not the first time that an employee came to the Miami Human Resources Department with a complaint regarding comments made by Benitez. Diaz testified that Benitez had said negative things about people—co-workers and others—for years. On May 3, 2005, Diaz, Suarez, Jose Ortega—another of Benitez's superiors—and Grillo met with Benitez to discuss his use of inappropriate language stemming from a different complaint. In the meeting, Benitez was not told the specific language that was considered offensive, but on the day after the meeting, he wrote in an email to Diaz, Suarez, Ortega, and Grillo that "[a]s to the meeting I had with you yesterday I wish to state that I stand corrected, and that in the future not one word will leave my lips without having been carefully considered."

On August 18, 2005, Natasha Manrique, another employee who Benitez supervised, filed a complaint against him with Human Resources alleging that Benitez used abusive, racially charged, and sexually suggestive language in her presence. The Human Resources Department, including Grillo, conducted an investigation into Benitez's conduct, which included an interview with another

3

employee, Karla Miranda, who stated that Benitez made comments with sexual overtones. The next day, Diaz, Suarez, Jose Ortega, and Grillo met with Benitez to discuss his conduct. At the meeting, Benitez was informed that sexually-charged, abusive, or derogatory comments were inappropriate in the workplace and would not be tolerated. He also was informed that if this behavior continued it could be grounds for termination. Diaz, Suarez, Ortega, and Grillo did not inform Benitez of the particular language discussed by Manrique in her complaint. Benitez also was not informed who filed the complaint.

On August 19, 2005, Benitez sought an appointment with Grillo to discuss the meeting of the previous day. Grillo's notes state that Benitez suspected that he was being held accountable for the actions of his employees, two of whom were discussing a television cartoon show that used obscenities. The notes state that Benitez felt that some of his staff mistakenly believed that he, not his employees, had used the off-color language. Grillo informed Benitez that this was not the source of the complaint, but that he could feel free to inform the employees that discussing the show was inappropriate.

On August 22, 2005, Benitez sent Grillo an email reiterating the facts of the incident that he previously discussed with her on August 19, 2005. In the email, Benitez stated that Julio Revuelta and others were discussing a cartoon television show that could be perceived by some to be offensive, although they did not use offensive language. He expressed concern that he was being held accountable for the conduct of his employees, and suggested that Human Resources conduct "a refresher sensitivity conference respecting courtesy to others and avoiding sexual harassment." Grillo's notes reflect that after receiving that email, she met with Suarez and Ortega regarding the need to clarify with Benitez the point of their previous meeting. The notes reflect that Diaz, Suarez, and Ortega again met with Benitez to reinforce that the complaint issued against him had nothing to do with the cartoon show, and that the complaint concerned his own abusive language and language with sexual overtones. Grillo's notes indicate that Benitez said that he understood.

Also on August 22, 2005, Benitez informed Grillo by email that Natasha Manrique was having a personal relationship with another employee at HSBC, and also that he recently discussed with Manrique that she had several times taken overly-long cigarette breaks. Grillo informed

4

Benitez that he should not discuss Manrique's personal relationship unless it was affecting her work performance, and that the smoking issue would be addressed company-wide.

The record reflects that Benitez was familiar with HSBC's Non-Harassment Policy, and, in fact, reported others under the policy. He was aware that verbal comments including racially-charged comments, comments with sexual overtones, abusive language, and obscenities were inappropriate and could lead to termination.

In response to Julio Revuelta's comments of January 7, 2009, Grillo and Rodriguez initiated an investigation of Benitez's comments and behavior. Over the course of the next week, Grillo and Rodriguez interviewed ten of the more than twenty employees working under Benitez, including Revuelta and Saludes. The employees who were interviewed informed Grillo and Rodriguez of a litany of comments that Benitez made which they considered offensive, including comments about sexual acts of many varieties, sexual violence, the sexual habits and acts of Benitez's employees, the anatomy of Benitez's female employees, the sexual orientations of his employees, hormone levels of his male employees, and sexually-transmitted diseases. Employees that Benitez supervised also informed Grillo and Rodriguez that Benitez made public comments belittling his employees, and that they felt threatened by him and frequently felt fear that Benitez might fire them. Benitez denies making any such comments, but does not provide evidence refuting HSBC's evidence that the employees relayed such comments to Human Resources. It is undisputed that these comments, if said, would violate HSBC's Non-Harassment Policy.[1]

Grillo compiled a file containing descriptions of her interviews with employees who worked under Benitez, and forwarded it to Simon Perkins—HSBC Senior Vice President, Head of Human Resources for Private Banking—and Patrick Wilkinson—Managing Director, Head of Human Resources for Global Banking and Markets. Both men were located in HSBC's New York office.

---

[1] Although HSBC describes in great detail the comments allegedly made by Benitez, the Court finds that it is unnecessary to do so in this Order, because the exact content of the comments is not dispositive or important with regard to the Motion for Summary Judgment. What is important is the manner in which HSBC responded to hearing about Benitez's alleged comments.

Neither Perkins or Wilkinson participated in the investigation, but they both independently reviewed the file and reached the decision to discharge Benitez for misconduct. The file sent to Perkins and Wilkinson also contained details regarding the 2005 complaint by Natasha Manrique. The notes submitted to Perkins and Wilkinson were silent as to Benitez's protests regarding the two clients who Benitez believed were improperly and illegally trading with Cuba. The only reference in the file to the Cuba issues was a note made by Grillo from her interview of Revuelta, which stated, "Julio has a situation with a client and trade with Cuba. Tomas [Benitez] said not to worry that you did everything right." Neither Perkins nor Wilkinson was aware that Benitez had alleged any violation of law or regulation, nor does the record show that either Grillo nor Rodriguez was aware of Benitez's complaints. Both Perkins and Wilkinson acknowledge that Richard Palmer, HSBC Deputy General Counsel, provided legal advice regarding the decision to terminate Benitez.

On January 23, 2009, HSBC terminated Benitez's employment without interviewing him regarding the allegations of the employees he supervised. Benitez notes that neither Diaz nor Suarez was informed about the decision to terminate Benitez until after the decision was made. Suarez stated that he would not have fired Benitez based on his performance. Benitez was paid his salary for 2008, but did not receive a discretionary bonus for that year. Benitez was not employed by HSBC at the time that discretionary bonuses were distributed.

## II.     ANALYSIS

HSBC moves for summary judgment on Count I (Florida Whistleblower Act), Count II (breach of contract), and Count III (unjust enrichment). For the reasons discussed below, the Court grants HSBC's Motion as to all three counts.

### A.     Count I:  Florida Whistleblower Act ("FWA")

Under the FWA, "[a]n employer may not take any retaliatory personnel action against an employee because the employee has . . . (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102. A district court may approach a retaliation claim brought pursuant to the FWA with the same burden-shifting analysis it would use for similar charges brought under Title VII. *Lockett v.*

*Choice Hotels International, Inc.*, 315 Fed. App'x 862, 868 (11th Cir. 2009); *Sierminski v. Transouth Financial Corp.*, 216 F.3d 945, 950 (11th Cir. 2000). Thus, "[o]nce [a] plaintiff establishes a prima facie case by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action." *Sierminski*, 216 F.3d at 950. If the defendant meets this burden, "[t]he burden then shifts back to the plaintiff to prove by a preponderance of evidence that the 'legitimate' reason is merely pretext for prohibited, retaliatory conduct." *Id*.

### 1.   *Prima Facie Case*

To establish a prima facie case of retaliation under the FWA, a "plaintiff must show (1) that there was a statutorily protected expression; (2) that an adverse employment action occurred; and (3) that there was a causal link between the [expression] and the adverse employment action." *Pinder v. Bahamasair Holdings Limited, Inc.*, 661 F. Supp. 2d 1348, 1351 (S.D. Fla. 2009). HSBC contends that Benitez has not established that he engaged in a statutorily protected expression, and that there was no causal link between the statutorily protected expression and the adverse employment action suffered by Benitez. Because the Court finds that HSBC succeeds in the latter argument, it will assume for the purposes of this discussion that Benitez engaged in a statutorily protected expression.

In order to establish the existence of a causal connection, "a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (internal quotations and alternations omitted); *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 717 (11th Cir. 2002) (*citing Gupta*, 212 F.3d at 590). Although "[c]lose temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated[,]" *Shannon*, 292 F.3d at 717–18, a decision-maker's unawareness of the plaintiff's protected conduct at the time of the decision creates the "absence of a nexus" between the conduct and the termination decision. *See Charlton v. Republic Services of Florida*, No. 09-22506-CIV, 2010 WL 2232677, at *9 (S.D. Fla. June 2, 2010) (finding the "absence of a nexus"

between the plaintiff's claims and his termination when the decision-maker did not become aware of the plaintiff's protected conduct until after the termination decision already was made).

Benitez fails to demonstrate that there exist genuine issues of material fact regarding whether Simon Perkins and Patrick Wilkinson, who ultimately made the decision to terminate Benitez, were aware that Benitez had complained about the legality of two clients' interactions with Cuba. Benitez even fails to demonstrate that Grillo or Rodriguez were aware of the concerns that Benitez voiced. First, Benitez concedes that neither Suarez nor Diaz, to whom he made the complaints, were involved in the decision to terminate him. The factual chronology reveals that after raising issues regarding Cuba, Benitez was informed that he would receive a bonus for 2008. Given that Diaz had a role in determining and announcing bonuses, that is strong circumstantial evidence that the concerns Benitez raised to Suarez and Diaz were not held against him.

Second, both Perkins and Wilkinson deny knowing that Benitez raised any issue regarding Cuba with Suarez or Diaz. Perkins and Wilkinson were insulated by the process HSBC used because they played no part in the investigation. They only reviewed the file that Grillo sent to them. Benitez's sole evidence that Perkins and Wilkinson knew that he had raised a concern regarding Cuba is a note from Grillo in her summary of an interview with Julio Revuelta, where Grillo noted that "Julio has a situation with a client and trade with Cuba. Tomas [Benitez] said not to worry that you did everything right." This sentence does not even suggest, much less convey to the reasonable reader that Benitez raised any concerns regarding illegal trade with Cuba. The lack of evidence supporting Benitez's claim of a nexus between his complaint and termination is similar to that found in *Charlton*. There the court found that a plaintiff's claim could not succeed when a decision-maker, through an affidavit, denied knowing about the plaintiff's complaint until after the termination decision was made, and the plaintiff provided no contradictory evidence. 2010 WL 2232677, at *9. Here, there is a similar dearth of evidence for Benitez's claim that Perkins and Wilkinson were aware of his complaint. Benitez presents neither direct nor circumstantial evidence sufficient to show that the concerns he raised to Suarez and Diaz regarding trade with Cuba were "not wholly unrelated" to his termination on January 23, 2009. In fact, the unrefuted evidence is to the contrary.

Perhaps sensing the obvious weakness of the facts supporting his claim, Benitez alternately theorizes that his firing was engineered by two employees he supervised—Revuelta and Saludes. Under Benitez's theory, HSBC's Human Resources, including Grillo and Rodriguez, and the two New York decision-makers—Perkins and Wilkinson—were a "cat's paw" for Revuelta and Saludes, who Benitez claims harbored animus toward him for his complaints regarding their clients' interactions with Cuba. As the Fifth Circuit has noted, "[i]n the employment context, the actions of ordinary, non-supervisory employees are not typically a basis for a claim." *Land v. Dietz*, 276 Fed. App'x 384, 387 (5th Cir. 2008). One exception to this "is where the decision-maker functions as the ordinary employee's 'cat's paw' such that the adverse employment decision could fairly be attributed to the employee." *Id*. at 387–88. In other words, "causation may be established if the plaintiff shows that the [decision-maker] followed the biased recommendation without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999); *see Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) ("In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers.").

Benitez's claims are wholly unsubstantiated. First, Benitez claims that Revuelta and Saludes bore animus toward him because his complaints regarding Cuba had the potential to negatively affect clients of Revuelta and Saludes. There is no evidence for this claim. Even assuming that Revuelta's and Saludes' statements about his behavior could be construed as a recommendation to terminate Benitez's employment, Benitez cites no evidence to suggest that either Revuelta or Saludes harbored animus toward him for his complaints regarding their clients' interactions with Cuba. In fact, Benitez points to no evidence that Revuelta or Saludes even were aware that Benitez had made such a complaint to Suarez and Diaz. The record indicates only that Benitez advised Revuelta that he should cooperate with HSBC's Compliance Department to ensure that HSBC did not violate U.S. law by conducting business with clients who interacted with Cuba. Likewise, Benitez points to no evidence that Saludes was aware that Benitez raised any concerns to Suarez and Diaz.

Second, even if the Court were to assume that Revuelta and Saludes were conspiring to prompt Benitez's termination, Benitez fails to provide any evidence indicating that the investigation

9

conducted by Grillo and Rodriguez, and the subsequent decision by Perkins and Wilkinson, was tainted by Revuelta's and Saludes' alleged enmity toward him. Benitez argues that Grillo and Rodriguez were derelict because they "only interviewed select individuals as directed by the complaining parties and did not inject [their] own judgment." Benitez has not supplied actual evidence supporting this conclusion. The evidence indicates the contrary. Grillo and Rodriguez interviewed ten of the more than twenty employees that Benitez supervised. An investigation in which nearly half of Benitez's employees were interviewed does not appear to be "hastily constructed," as Benitez alleges it was. Moreover, Benitez does not provide evidence that any of the other employees who Grillo and Rodriguez interviewed bore any vendetta against him for his complaints regarding the interactions of those two HSBC clients with Cuba; still, those employees corroborated the statements by Revuelta and Saludes, and added further details regarding what they perceived as inappropriate comments by Benitez. There is no evidence that Grillo and Rodriguez, in investigating Benitez, were a mere rubber stamp for Revuelta and Saludes. Again, the evidence indicates the contrary; that they took precautions to conduct an independent investigation. Moreover, Grillo and Rodriguez had reason to believe that Benitez had made such comments, based on the previous complaints about him. Therefore, there is no evidence to support Benitez's theory that Perkins and Wilkinson, who made the decision to terminate Benitez, or Grillo and Rodriguez, were mere conduits for Revuelta's or Saludes' alleged animus. Because Benitez fails to demonstrate that the decision-makers were aware of his statutorily protected expression and also fails to show that the decision-makers were a "cat's paw" for employees harboring a grudge against Benitez, Benitez cannot establish a prima facie case of retaliation under the FWA.

### 2. Pretext

Even if the Court were to assume *arguendo* that Benitez had evidence establishing a prima facie case of retaliation under the FWA, Benitez is unable to refute HSBC's evidence supporting its proffered legitimate reason for terminating his employment—reports by Benitez's employees of his allegedly inappropriate, obscene, and abusive statements to and about his employees. This Court does "not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, [the Court's] inquiry is limited to whether the employer gave an honest explanation of its

behavior." *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Meching v. Sears, Roebuck, and Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)) (internal quotations omitted). HSBC undoubtedly has "proffer[ed] a legitimate reason for the adverse action" taken against Benitez, because it points to significant evidence regarding Benitez's behavior that it considered in its decision to terminate him. *Sierminski*, 216 F.3d at 950. Therefore, Benitez would need to "prove pretext either by showing that a [retaliatory] reason more likely motivated [HSBC] or by showing that [HSBC's] proffered explanation is unworthy of credence." *Corbin v. Southland International Trucks*, 25 F.3d 1545, 1550 (11th Cir. 1994). Benitez's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Carter v. University of South Alabama Children's & Women's Hospital*, 510 F. Supp. 2d 596, 611 (S.D. Ala. 2007) (citing *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005)).

Benitez presents no evidence that meets this standard. First, as discussed above, Benitez did not provide any evidence supporting his theories that Perkins and Wilkinson were "cat's paws" for Revuelta or Saludes, or that HSBC's decision to terminate him was motivated by any animus in reaction to his complaints regarding clients' interactions with Cuba. Second, Benitez argues that he was treated differently than others because others at HSBC used inappropriate, obscene, and profane language but were not terminated for use of that language. However, the fact that others at HSBC used inappropriate, obscene, and profane language is irrelevant unless Benitez demonstrates that HSBC's Human Resources Department, or Perkins or Wilkinson, were aware of instances of inappropriate language, and that they neglected to conduct follow-up investigations of individuals who made such offensive comments. Benitez provides no such evidence. Finally, Benitez states that previously when he made inappropriate comments, they were ignored by Diaz. Benitez argues that this is an indication that his termination was for a reason other than the comments he allegedly made in 2008. The evidence does not support this conclusion. Diaz testified that he was aware of previous negative comments that Benitez had made, and that Diaz and others had discussed these comments with Benitez. Diaz, however, indicated that he did not refer the late-2008 complaints regarding Benitez's comments to Human Resources. The mere fact that Benitez's particular superiors (*i.e.*,

11

Diaz) knew about and tolerated his inappropriate behavior in one instance does not mean that HSBC's management (*i.e.*, Grillo and Rodriguez, and then Perkins and Wilkinson) was required to do the same once they found out about the inappropriate comments.[2] For these reasons, even assuming *arguendo* that Benitez presents a prima facie case for retaliation under FWA, the Court finds that Benitez has not presented evidence sufficient to prove that HSBC's proffered explanation was pretext.

### B. Count II: Breach of Contract

HSBC moves for summary judgment on Count II of Benitez's Complaint, arguing that HSBC had no contractual obligation to pay Benitez a bonus for his work done in 2008, and that he did not qualify for a bonus under the terms of his employment contract because he was not employed by at the time that bonuses were awarded. For the reasons discussed below, the Court grants Defendant's Motion for Summary Judgment as to Count II.

In order to prove that he was entitled to a year-end bonus for 2008, Benitez must demonstrate that he had an agreement with HSBC that was supported by consideration. *See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290 (11th Cir. 1998) ("It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration."). For a contract to be enforceable, the parties' purported agreement must evidence a meeting of the minds regarding the essential terms of the contract. *See Winter Haven Citrus Growers Association v. Campbell & Sons Fruit Co.*, 773 So.2d 96, 97 (Fla. 2d Dist. Ct. App. 2000); *Metropolitan Dade County v. Estate of Hernandez*, 591 So.2d 1124, 1124–25 (Fla. 3d Dist. Ct. App. 1992).

Benitez does not prove that he had a contract with HSBC that required HSBC to pay him a bonus, because he provides no evidence about a meeting of the minds regarding essential terms of his bonus. In support of his argument that there existed a contract between him and HSBC requiring

---

[2] If anything, Diaz's testimony that he had previously heard about Benitez's inappropriate comments lends further credence to the eventual decision by HSBC's management to terminate Benitez, because it supplies more evidence that Benitez violated HSBC's Non-Harassment Policy.

that HSBC pay him a bonus, Benitez points to his 2008 year-end conversations with Diaz, where Diaz informed Benitez that he had submitted bonus paperwork, and a subsequent conversation with Diaz where Diaz informed Benitez that Benitez and his employees would be receiving bonuses for their 2008 work. However, Benitez concedes that the amount of the bonus was not discussed. The amount of the bonus to be paid is an essential element of a contract. *See Winter Haven Citrus Growers Association*, 773 So.2d at 97 (noting that the amount of goods at issue and the time for performance are material terms of a contract that must be specified at the time of the agreement). Therefore, Benitez does not prove an essential element of his contract claim.

Additionally, it is clear that when the decision to grant a bonus is left to the sole discretion of an employer, any promise by the employer to pay a bonus is unenforceable as an illusory promise. *See OneSource Facility Services, Inc. v. Mosbach*, 508 F. Supp. 2d 1115, 1124 (M.D. Fla. 2007). HSBC's Compensation Administration Policy explicitly states that "[a]ll bonuses are strictly discretionary." The Policy further states that "[t]he Company reserves the sole right to add, amend, or discontinue any and all salary administration programs . . . including . . . bonuses . . . for any reason and without prior notice." The Compensation Administration Policy makes clear that the decision to grant a bonus to any employee was entirely within HSBC's discretion. Thus, Diaz's alleged promise that Benitez would receive a bonus for 2008 was an unenforceable, illusory promise, not a contract.

Finally, even assuming for argument's sake that HSBC's Compensation Administration Policy was an enforceable contract, Benitez did not qualify for a bonus because he was not employed at the time that bonuses were awarded. If an employer's compensation policy states that entitlement to a bonus is conditioned upon the employee being employed with the company at the time that bonuses are issued, he is not entitled to a bonus if he is terminated before bonuses are awarded. *See OneSource Facility Services*, 508 F. Supp. 2d at 1124. HSBC's Compensation Administration Policy makes clear that an employee must be employed with HSBC at the time that bonuses are awarded in order to be eligible for a bonus. In prior years, Benitez also had received bonus letters reminding him of this policy. Thus, assuming that HSBC's Compensation Administration Policy

was an enforceable contract, Benitez did not qualify for a bonus because he was not employed by HSBC at the time that bonuses were awarded.

The cases that Benitez cites are inapposite because they both involve employment contracts in which material details regarding the compensation, such as the rate at which compensation was earned or vested, was specified in the parties' agreement. *See Patwary v. Evana Petroleum Corp.*, 18 So.3d 1237, 1238 (Fla. 2d Dist Ct. App. 2009) (discussing how the parties had a profit-sharing agreement where the plaintiff would receive a fifty percent share of net profits for the pendency of the agreement); *Abbott v. Tec-Mill & Supply, Inc.*, 178 So.2d 881, 881–82 (Fla. 3d Dist. Ct. App. 1965) (noting that the plaintiff and defendant had an agreement that plaintiff's compensation would be $50.00 per week plus a 2% commission on all sales that he made). The present case differs because Benitez bases his claim solely on an after-the-fact promise from Diaz that Benitez could expect a bonus of an unspecified amount. It is clear that such a statement does not create an actionable contract. Moreover, HSBC had a written policy in place stating that an employee only could be eligible for a bonus if he was employed at the time that bonuses were awarded. This is a specific, clear pre-condition that Benitez did not meet. For these reasons, the Court grants HSBC's Motion as to Count II.

### C.   Count III:   Unjust Enrichment

HSBC moves for summary judgment as to Benitez's unjust enrichment claim, arguing that Benitez was paid in full for the work he was hired to complete and, therefore, is not entitled to any equitable recovery. For the reasons discussed below, the Court grants HSBC's Motion for Summary Judgment as to Count III.

In Florida, to prove a claim for unjust enrichment, a plaintiff must demonstrate: "(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009). Furthermore, "equitable relief is not available where the plaintiff has provided a defendant with no more than that which he was hired to do and for which he was paid his

salary." *Sleit v. Ricoh Corp.*, No. 8:07-cv-724-T-23TBM, 2008 WL 4826113, at *10 (M.D. Fla. Nov. 4, 2008); *see Gene B. Glick Co. v. Sunshine Ready Concrete Co.*, 651 So.2d 190, 190 (Fla. 4th Dist. Ct. App. 1995) ("Unjust enrichment is equitable in nature and cannot exist where payment has been made for the benefit conferred.").

Benitez cannot recover under a theory of unjust enrichment because the terms under which Benitez was hired make clear that, as an HSBC employee, he "receive[d] pay for work performed," and any bonus would be distributed solely at the discretion of HSBC. Moreover, HSBC's Compensation Administration Policy stated the specific requirement that the employee had to be employed at the time that bonuses were awarded in order to be entitled to a bonus. If the Court were to grant equitable relief, it would impermissibly rewrite the terms of the employer-employee relationship.

The case Benitez cites, *Florida Power Corp. v. City of Winter Park*, provides no support for his argument because the facts are materially dissimilar. 887 So.2d 1237, 1241 (Fla. 2004). In that case the Florida Supreme Court found that the petitioner, Florida Power Corporation, would be unjustly enriched if it was allowed to collect additional fees without passing through the fees to the City of Winter Park, when the fees were meant to go to the City of Winter Park. *Id*. at 1241–42. The Florida Supreme Court characterized this as a windfall for Florida Power Corporation. *Id*. Unlike the defendant in *Florida Power Corp.*, HSBC has reaped no windfall as a result of terminating Benitez's employment. While Benitez was employed, HSBC received the work that Benitez was hired to do, and received nothing extra upon terminating him. Benitez had no agreement specifying the rate at which he earned or would vest in a bonus. The Court will not rewrite the terms of Benitez's employment with HSBC. Therefore, the Court grants HSBC's Motion as to Count III.

**IV.   CONCLUSION**

For the reasons discussed above, Defendant HSBC's Motion for Summary Judgment is GRANTED.

DONE AND ORDERED in Chambers, Miami, Florida, on December 30, 2010.

_____

Paul C. Huck
United States District Judge

**Copies furnished to:**
All Counsel of Record